In re TOYOTA MOTOR CORP. UNIN-
TENDED ACCELERATION MAR-
KETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGA-
TION.

This document relates to:

All Foreign Plaintiffs' Economic
Loss Cases.

Case No. 8:10ML 02151 JVS (FMOx).

United States District Court,
C.D. California.

Nov. 30, 2011.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND
MOTION TO STRIKE

JAMES V. SELNA, District Judge.

Table of Contents

I. Introduction and Overview ............................................1185

II. Judicial Notice ....................................................1186

III. Article III Standing ...............................................1187
 A. Injury In Fact ................................................1187
 B. Causation ....................................................1190
 C. Redressability ...............................................1192
 D. Conclusion as to Article III Standing ........................1193

IV. Rule 19: Necessary and Indispensable Parties ...............................1193
 A. Legal Standard ......................................................1193
 B. Summary of Earlier Ruling ..........................................1193
 C. Amendments to SAC ...............................................1194
 1. Manufacturing–Based Claims ....................................1195
 2. Deceptive Marketing Claims ....................................1195
 D. Rule 19 Conclusion .................................................1198

V. Standard for Dismissal Pursuant to Rule 12(b)(6) ...........................1198

VI. RICO ...................................................................1199
 A. Factual Allegations Underlying RICO Claim ...........................1199
 B. RICO's Extraterritorial Reach........................................1200
 C. RICO Elements and Pleading–with–Particularity Requirements ...........1201
 D. Section 1962(c) Pleading Requirements ...............................1202

VII. California Consumer Fraud Claims and Fraudulent Concealment ..............1203
 A. Extraterritorial Reach of UCL & CLRA ...............................1203
 B. UCL & CLRA Analysis..............................................1204
 1. CLRA Notice ..................................................1204
 2. Amended Statutory Claims ......................................1205
 C. Fraudulent Concealment.............................................1205
 D. Conclusion Regarding California Consumer Fraud Claims and
 Fraudulent Concealment...........................................1206

VIII. Products Liability (Design Defect) and Negligence ..........................1206

IX. Motion to Strike .........................................................1207

X. Conclusion ..............................................................1208

Currently before the Court are a Motion to Dismiss and a Motion Strike directed toward the operative complaint filed by a putative class of foreign Plaintiffs.

## I. *Introduction and Overview*

This action arises out of Plaintiffs' purchase of vehicles designed, manufactured, distributed, marketed, sold, and leased by Defendants Toyota Motor Corporation ("TMC") and its subsidiaries, Toyota Motor North America, Inc. ("TMA"), Toyota Motor Sales, U.S.A., Inc. ("TMS"), and Toyota Motor Engineering and Manufacturing North America, Inc. ("TEMA")[1] (collectively, "Toyota" or "the Toyota Defendants").[2]

A putative class of foreign Plaintiffs[3] seeks damages for alleged defects in those

1. The Court previously dismissed with prejudice all claims asserted against Toyota Motor Credit Corporation ("TMCC"), whose business of financing was incompatible with Plaintiffs' theories of liability. (*See* April 8, 2011, Order, 785 F.Supp.2d 883, 901–02 (C.D.Cal.2011) ("Dismissal Order").)

2. Where relevant to the analyses set forth herein, the Court's references to the Toyota Defendants collectively, to subsets thereof, or to a specific entity individually, are purposeful. The Court has endeavored to be as specific and precise as possible. Specifically, the Court uses "the U.S. Toyota Defendants" or "the domestic Toyota Defendants" to refer to TMS, TMA, and TEMA collectively. Elsewhere, the Court discusses certain unnamed foreign Toyota entities, and there, the Court finds it necessary to refer to "the named Toyota Defendants" to differentiate between the named parties and certain unnamed foreign entities.

3. The Court has twice considered Motions to Dismiss and Strike directed toward similar claims asserted by a putative class of domestic plaintiffs, granting in part and denying in

vehicles. The operative Complaint addressed herein is the Corrected Second Amended Foreign Economic Loss Master Consolidated Complaint ("SAC").[4] (Docket No. 1632). In the SAC, Plaintiffs assert claims under federal law and California law.[5] Specifically, the SAC asserts claims for: (1) Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"); (2) Violations of the Consumer Legal Remedies Act, Cal. Civ.Code §§ 1750, *et seq.* ("CLRA"); (3) Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"); (4) Fraud by Concealment; (5) Negligence; and (6) Products Liability (Design Defect).

In the present Motion to Dismiss, the Toyota Defendants challenge the Court's subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, maintaining Plaintiffs have failed to establish Article III standing and, in the event the remaining federal claim is dismissed, the Court's diversity jurisdiction is not properly invoked by alien Plaintiffs against TMC, an alien Defendant. (*See* Docket No. 1762.) The Toyota Defendants also move pursuant to Rule 12(b)(7) to dismiss all claims for failure to join indispensable parties as defined by Rule 19(b). (*Id.*) Finally, pursuant to Rule 12(b)(6), they move to dismiss a number of claims for failure to state a claim upon which relief can be granted, including claims measured by the pleading-with-particularity requirement of Rule 9(b). (*Id.*) Plaintiffs have filed an Opposition thereto, and the Toyota Defendants have filed a Reply brief. (*See* Docket Nos. 1798 & 1875.)

Additionally, in the separate Motion to Strike, the Toyota Defendants move to strike a paragraph from the SAC that alleges mutual agency among the Toyota Defendants, which Plaintiffs oppose. (*See* Docket Nos. 1672, 1799 & 1872 (Reply).)

The SAC asserts claims on behalf of Plaintiffs in fourteen countries, including, *inter alia,* Canada, Mexico, China, Germany, Russia, and Australia. (SAC ¶¶ 18–34.) At the hearing on the present Motions, and after review of a comprehensive tentative Order issued by the Court in advance of the hearing, Plaintiffs' counsel expressed intent to "focus" solely on behalf of Plaintiffs in Canada and Mexico.[6] As noted herein, the Court has considered that express limitation, as well as arguments of counsel for both sides.

For the reasons set forth below, the Court grants both Motions.

## II. *Judicial Notice*

The Toyota Defendants have filed a Request for Judicial Notice. (*See* Request for Judicial Notice ("RJN") (Docket No. 1673–2).) Specifically, the Toyota Defen-

---

4. The Court dismissed previously all claims asserted by the Foreign Plaintiffs in their earlier Complaint. (*See generally* Dismissal Order, 754 F.Supp.2d 1145 (C.D.Cal.2010); May 13, 2011, Order, 790 F.Supp.2d 1152 (C.D.Cal.2011).) The Court's reference to "Plaintiffs" herein should be understood as referring only to the foreign Plaintiffs who assert economic loss claims, except where, in context, the reference clearly denotes another group of Plaintiffs.

part those Motions. (*See* Nov. 30, 2010 Order, 754 F.Supp.2d 1145 (C.D.Cal.2010); May 13, 2011, Order, 790 F.Supp.2d 1152 (C.D.Cal.2011).) Although the Court dismissed a number of claims with prejudice, the Court granted leave to replead other claims. (*Id.*)

5. Plaintiffs voluntarily and expressly limit their state-law claims to those arising under California law. (SAC ¶ 11.)

6. The Court construes this limitation as an intent by Plaintiffs to submit on the tentative Order as to the Plaintiffs in countries other than Canada and Mexico.

dants request the Court take judicial notice of three items:

(1) A Toyota Mexico-based web site (referenced in the SAC ¶¶ 2, 611 & n. 75). (*See* RJN at 2.)

(2) A Canadian advertising brochure for 2010 Toyota Corolla (referenced in SAC ¶ 610). (*See* RJN at 3.)

(3) Finally, a Canadian class action complaint filed against TMC, TMA, and Toyota Canada, Inc., by "all persons who purchased or leased a Toyota or Lexus vehicle equipped with the electronic throttle control system." (RJN at 3.)

Pursuant to Federal Rule of Evidence 201, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(d). An adjudicative fact may be judicially noticed if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Generally, courts may take judicial notice of public documents. *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001). Additionally, courts may take judicial notice of documents incorporated by reference in the operative complaint. *See, e.g., al-Kidd v. Ashcroft,* 580 F.3d 949, 954 n. 6 (9th Cir.2009).

■■ Here, both the web site [7] and the brochure are incorporated by reference in the SAC.[8] (SAC ¶¶ 610–11.) The Canadian class action complaint is a public record, and Plaintiffs do not dispute its authenticity. (*See* RJN Ex. 4 (bearing Clerk of Court seal).) Because the materials proffered by the Toyota Defendants embrace proper subjects of judicial notice, the Court takes judicial notice of them and considers them in connection with the pending motions. *See Mir v. Little Co. of Mary Hosp.,* 844 F.2d 646, 649 (9th Cir. 1988) ("In addition to the complaint, it is proper for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss.").

### III. *Article III Standing*

#### A. *Injury In Fact*

■ In the Dismissal Order, the Court considered whether Plaintiffs satisfied the three elements of Article III standing under the Constitution. Those three elements are: (1) Plaintiffs must suffer an "injury in fact," (2) Plaintiffs must allege a causal connection between the injury and the conduct complained of, and (3) Plaintiffs must demonstrate redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Court dismissed the prior complaint because Plaintiffs' allegations regarding the market effect of the alleged defects in the United States were insufficient to establish injury in fact with

---

**7.** This is a Spanish-language web site. Absent a translation, it is of little probative value to the present proceedings. Nevertheless, the Court takes judicial notice of its existence as a document incorporated by reference in the SAC. (SAC ¶ 611 & n. 75.)

**8.** In any event, even if these materials were not the proper subjects for judicial notice, to the extent they are relevant to the joinder issue, these materials are relevant, admissible evidence. A Rule 12(b)(7) motion to dismiss for failure to join an indispensable party is a fact-specific, practical inquiry, and the moving party bears the burden in producing evidence in support of the motion. *See Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990); *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994).

respect to foreign Plaintiffs. (Dismissal Order, 785 F.Supp.2d at 900–01.) In addition, the complaint lacked allegations that each lead Plaintiff suffered loss. (*Id.* at 901.)

Plaintiffs made certain amendments in an attempt to correct these deficiencies. Toyota argues that Plaintiffs still lack Article III standing and moves to dismiss the SAC in its entirety on this ground. Toyota points to the Dismissal Order, which stated Plaintiffs " 'must allege publicity regarding SUA incidents in the relevant secondary market for their vehicles, *i.e.*, in their home countries.' " (Defs.' Mem. at 5 (quoting Dismissal Order, 785 F.Supp.2d at 901).) Instead of following this guidance, Toyota contends that Plaintiffs base their vehicle devaluation arguments once again on U.S.-based market effects. Toyota cites a lack of allegations regarding negative publicity in all non-U.S. countries except for Canada. (*Id.* at 6.) With respect to Canada, Toyota argues that the article cited by Plaintiffs actually disproves the inference of reduced demand as a result of negative publicity in Canada. (*Id.* at 7.)

In opposition, Plaintiffs argue that their claims are "factually and legally on all fours with the claims of the domestic plaintiffs in this MDL," based on the corporate structure of Toyota. (Opp'n at 3.) Because the Court found the domestic plaintiffs' allegations regarding standing sufficient, foreign Plaintiffs' allegations must likewise be accepted. (*Id.* at 4.) Each foreign Plaintiff alleges he or she was exposed to Toyota advertising regarding reliability and safety, this influenced each Plaintiff's decision to buy a Toyota, and if the SUA defect had been disclosed, each Plaintiff would not have purchased a Toyota vehicle or would have paid less for the vehicle. (*Id.* at 4, 6.) Plaintiffs point out that some named Plaintiffs also allege manifestation

of the defect, which Toyota admits results in a financial loss. (*Id.* at 4 & n. 7, 10.) Plaintiffs further argue that when the SAC is viewed as a whole, the law of the case mandates that they should have standing, just as the domestic plaintiffs do. (*Id.* at 7.)

As an initial matter, the Court rejects Plaintiffs' arguments that this case is legally and factually on all fours with the domestic plaintiffs' case and that the law of the case somehow dictates the result here. Whether the domestic plaintiffs have established Article III standing is irrelevant to whether foreign Plaintiffs have done so because each Plaintiff must allege his or her own injury in fact. The fact that because the same economic loss theories are advanced in both cases does not make them one and the same. The putative domestic class of plaintiffs does not encompass foreign Plaintiffs and, under the previous Orders of the Court, the foreign Plaintiffs must proceed on the merits of their own case through the filing of their own consolidated complaint. Foreign Plaintiffs must assert their own legal rights and interests without regard to the legal rights and interests on which the domestic plaintiffs rely. *See Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ The Court finds that Plaintiffs' amendments fail to allege market effects supporting an alleged economic loss in each Plaintiff's home country. As in the prior complaint, the SAC bases Plaintiffs' alleged injuries on evidence purportedly showing a decline in market value for Toyota vehicles in the United States. Plaintiffs do not explain how publicity in the United States and its resulting effect on the value of Toyota vehicles in the United States extends to each of their home countries.

Plaintiffs argue they have made this showing by alleging that publicity regarding the SUA defect reached the secondary markets of their home countries. (Opp'n at 8 (citing SAC ¶ 414, 439, 646, 647).)

The portions of the SAC to which Plaintiffs cite do not support this argument. These paragraphs instead allege that (1) Toyota Motor Europe issued a "Technical Information" to Toyota distributors in various European countries regarding repairs to address sticky pedals and SUA (¶ 414), (2) Toyota issued a separate "Technical Instruction" to Toyota distributors in the United Kingdom and Ireland regarding pedal repairs (¶ 439), (3) a Canadian Press report noted devaluation of Toyota vehicles by U.S.-based Kelley Blue Book ("KBB") (¶ 646), and (4) sticky pedal recalls were issued worldwide, and the same Canadian Press report envisioned this would "likely impact demand," citing a survey of KBB customers (¶ 647). Plaintiffs go on to allege, in a conclusory fashion, that the devaluation effects have been felt across the United States, North America, and throughout the world (¶¶ 648, 650).

These allegations do not support an inference that foreign Plaintiffs experienced an injury based on market effects in their home countries. The first two paragraphs point to communications with distributors. No allegations link these communications to customers or the public at large, which could suggest a market effect in Europe. The third and fourth paragraphs, citing a Canadian Press report, reference devaluation of vehicle values in the United States by KBB. The Canadian Press report says nothing about devaluation in Canada, let alone other countries in which Plaintiffs reside. The author notes the worldwide recalls and speculates it will likely impact demand for used Toyotas, but does not provide any concrete information about devaluation in any specific country besides the U.S., based on KBB's devaluation. (SAC, Ex. E.)[9] The report states that one Canadian used-car dealer *thinks* negative publicity will have short-term impact on the value of used Toyotas, but it does not state that any such impact has been felt in Canada; moreover, neither do Plaintiffs allege that such an impact has actually been felt. (*See* ¶ 647.) Indeed, the same report itself also reports that a representative from Autotrader.ca has not noticed a change in pricing for used Toyotas. (SAC, Ex. E.)

Plaintiffs attempt to salvage this argument by concluding that devaluations by KBB and the National Automobile Dealers Association ("NADA"), another U.S.-based company, have had "international reach." (Opp'n at 9.) Plaintiffs cite these allegations, as well as "the worldwide recalls and other notices disseminated worldwide by Toyota concerning the defects" in order to establish standing. (*Id.* at 8.) The statement that vehicle values declined in all relevant countries due to devaluation by two U.S. companies as well as a worldwide recall and distributor notices is conclusory. Despite the Court's clear directive that Plaintiffs allege such market effects in each of their respective home countries, they have failed to do so. While it may be possible that KBB and NADA devaluations affect vehicle prices in some other countries, Plaintiffs allege no facts linking devaluations by these two U.S. companies with aftermarket vehicle prices in their home countries.

9. The Exhibits to the SAC were not refiled with the Corrected Second Amended Foreign Economic Loss Master Consolidated Complaint (Docket No. 1632), which is the operative Complaint. Instead, they are found at Docket No. 1495. The Court treats these exhibits as if they had been refiled with the corrected pleading.

To the extent Plaintiffs argue that a worldwide recall may act as a proxy for alleging injury in fact on behalf of vehicle owners affected by the recall, the Court rejects this argument. Such a shortcut would obliterate the requirement to clearly allege facts in the complaint to demonstrate standing. *See W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981). There is no basis here to assume that the market for Toyota products is homogenous throughout the world, and unaffected by the characteristic of local markets, such as local preferences, the status of the local economy, and the supply and demand characteristics of the local market. Said another way, there is no basis to assume that the American automobile market is a fair surrogate for every other market in the world.

■ Nevertheless, despite the failure to allege market effects in their home countries, Plaintiffs correctly point out that they have availed themselves of another alternative identified by the Court for establishing injury in fact. Specifically, in an Order relating to the domestic plaintiffs' economic loss claims, the Court held that allegations of overpayment for a vehicle because a consumer bargained for a defect-free vehicle but received a defective vehicle, coupled with allegations of either market effects leading to diminution in value *or* "sufficiently detailed, non-conclusory allegations of the product defect," would suffice. (*See* Docket No. 1623 at 22–25 & nn. 10–12.) Here, Plaintiffs allege they suffered benefit-of-the-bargain damages, and they allege detailed, non-conclusory allegations of the product defect. Like the domestic plaintiffs, foreign Plaintiffs include allegations that certain Plaintiffs have experienced SUA, and they set forth detailed allegations regarding SUA and its possible causes. (*See* SAC ¶¶ 150–536, 112–127.)

Accordingly, because Plaintiffs allege damages together with non-conclusory allegations of a product defect, Plaintiffs meet the injury in fact requirement of standing.

In the Dismissal Order, because the Court found no injury in fact, the Court declined to reach the second and third elements of standing. Because the Court concludes otherwise today, the Court addresses those elements here.

### B. Causation

Toyota argues that Plaintiffs fail to link their alleged injury, loss in vehicle value, to acts or omissions by the U.S. Toyota Defendants. (Defs.' Mem. at 7.) Toyota contends that Plaintiffs' allegation of trying to return their vehicles due to fear of SUA and Toyota refusing to buy back the vehicles is factually unsupported and not plausible. (*Id.* at 8.) Even if taken as true, if Plaintiffs attempted to return their vehicles in their home countries, the refusal necessarily would have come from nonparty Toyota sales and manufacturing entities. (*Id.*) Toyota seeks dismissal of the SAC because Plaintiffs fail to allege facts showing that U.S. actions, undertaken by the named Toyota Defendants in the U.S., actually caused a decrease in vehicle value in Plaintiffs' home countries. (*Id.* at 9.)

Plaintiffs respond that the SAC makes clear that TMC and TMS promulgated false and misleading advertising which was disseminated worldwide. (Opp'n at 10.) Plaintiffs point to the allegation that "the decision to withhold information from worldwide consumers, and to engage in deceptive marketing was made, at least in part, in California." (SAC ¶ 15.) Plaintiffs also state that because TMC controls design of the defective vehicles, they can be held liable for pushing these design and safety decisions down to manufacturers and distributors worldwide. (Opp'n at 10.)

This includes the decision not to implement sticky pedal and floor mat design changes throughout the world when such changes were being offered in the U.S. (Opp'n at 10 (citing SAC ¶¶ 479–80).)

As an initial matter, the Court agrees that the SAC lacks Plaintiff-specific factual allegations regarding any attempt to return vehicles to "Toyota," which presumably means the vehicle distributors or manufacturers in each home country. Plaintiffs' general allegations that some foreign Plaintiffs tried to return their vehicles and were refused a refund (¶ 639) are unsupported by any allegations that any particular Plaintiff did so. Although an identical allegation was plausible in the domestic plaintiffs' complaint, several named plaintiffs in that case alleged that they attempted to return their vehicle to the place of purchase. (*See, e.g.,* SAELMCC ¶¶ 34, 36, 49, 50.) Here, there are no factual allegations made on behalf of the foreign Plaintiffs that support this contention.

However, this allegation is not crucial to Plaintiffs' economic loss theory of damages. The real issue is whether the SAC implicates conduct by the named Toyota Defendants which led to Plaintiffs' alleged losses. In other words, is Plaintiffs' alleged drop in vehicle value "fairly traceable" to actions taken by the named Toyota Defendants? *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

■ Plaintiffs allege that TMC designs and markets Toyota vehicles throughout the world and TMC is responsible for the defective designs affecting foreign Plaintiffs. (SAC ¶¶ 44, 50, 86–87.) Plaintiffs claim that whoever was responsible for manufacturing their defective vehicles did so pursuant to a design "created, supplied, and controlled by TMC pursuant to 'The Toyota Way.'" (*Id.* ¶¶ 74, 89.) Plaintiffs allege that TMS, Toyota's U.S. sales and marketing arm, is responsible for implementing TMC's "core marketing and sales message throughout North America [and] that same message is disseminated throughout the World...." (*Id.* ¶¶ 56–57.) Plaintiffs believe that TMS supervises Toyota marketing to ensure a uniform message is presented to consumers. (*Id.* ¶ 58.) While proclamations of safety and reliability permeate this uniform message, Plaintiffs claim this was misleading and deceptive because the marketing campaigns did not disclose the SUA defect or lack-of-fail-safe defect. (*Id.* ¶ 596.)

The foregoing allegations demonstrate that Plaintiffs believe their economic loss was caused by (1) TMC's defective designs, and (2) TMS's implementation of a misleading advertising campaign that withheld information regarding the defects and unjustifiably touted safety and reliability. Plaintiffs do not explain how TMA or TEMA caused their alleged economic loss. Plaintiffs' general allegations of "Toyota" cannot be linked to either TMA or TEMA given the absence of specific factual allegations about either Defendant's involvement. Thus, the injuries are not fairly traceable to either TMA or TEMA.

With respect to TMC, the Court finds Plaintiffs have alleged sufficient facts demonstrating that TMC's defective designs resulted in devaluation of their vehicles purchased under the guise of defect-free vehicles. As the Court has said before, a defective vehicle is worth less than a defect-free vehicle. However, the same is not true for TMS. Plaintiffs base TMS's responsibility for their alleged injuries on TMS's role in Toyota's marketing and advertising, which deceived customers into believing that Toyota vehicles were reliable and safe, while concealing safety defects. Plaintiffs' allegation that TMS is

responsible for implementing TMC's marketing message *in the United States* is insufficient to suggest TMS's marketing caused foreign Plaintiffs to purchase their vehicles, believing them to be safe.

■ Plaintiffs state that TMS's U.S.-based marketing message, premised on "The Toyota Way," was disseminated throughout the world. (SAC ¶¶ 56–57.) However, the SAC is devoid of allegations linking TMS's advertising and marketing efforts in the U.S. with Plaintiffs in other countries. Although domestic plaintiffs raised similar allegations against TMS, which were sufficient because those plaintiffs alleged facts to show they relied on TMS's marketing messages, no such allegations are present here to link TMS's U.S.-based advertising activity with foreign Plaintiffs. Plaintiffs fail to explain how the Toyota entity responsible for U.S. marketing impacted the buying decisions of Toyota customers worldwide. Plaintiffs do not support the allegation that a California-based decision by TMC and/or TMS regarding concealment of defect-related information, had worldwide impact. (SAC ¶ 15.) This is a conclusion lacking the "factual content" required to support Plaintiffs' claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 173 L.Ed.2d 868 (2009).

At oral argument, Plaintiffs' counsel pointed to paragraphs 57 and 668 of the SAC in an attempt to demonstrate causation as to TMS with respect to those foreign Plaintiffs residing in Canada and Mexico. Paragraph 57 is a conclusory allegation regarding TMS's responsibility for North American advertising, which advertising messages are then disseminated throughout the world. (SAC ¶ 57.) No factual allegations explain how Plaintiffs

concluded that TMS is responsible for all North American advertising, including Canada and Mexico. Thus, this paragraph is insufficient to support causation at to TMS. Similarly, paragraph 668 mentions in passing that TMS "is the sales and marketing arm for Toyota in North America[,]" and that TMS "sold and marketed Toyota vehicles that were defective[.]" No factual allegations explain TMS's purported role as the sales and marketing arm for North America, how this role impacted Canadian and Mexican Plaintiffs, or how Canadian and Mexican Plaintiffs' injuries are fairly traceable to TMS. The general statement about responsibility for defective vehicles is not linked in any way to these Plaintiffs.

At the hearing on the motion to dismiss the prior complaint, Plaintiffs suggested TMS's advertising was broadcast or disseminated into foreign countries.[10] However, Plaintiffs abandoned these allegations in the SAC. Without factual allegations supporting Plaintiffs' theory that TMS's marketing reached them abroad, Plaintiffs have not shown that their alleged economic loss is fairly traceable to TMS's U.S.-based marketing actions. While Plaintiffs may have such a claim against the Toyota entity responsible for exposing them to allegedly misleading advertising, no facts alleged in the SAC suggest that TMS is responsible.

Thus, Plaintiffs allege facts to support the causation element of standing with respect to TMC only.

### C. *Redressability*

As to the damages claims, Toyota argues that the Court already recognized that Plaintiffs cannot obtain complete re-

---

10. At oral argument on the present motions, Plaintiffs expanded this suggestion to include Mexican Plaintiffs purportedly viewing TMS advertisements during satellite broadcasts of NASCAR events, an allegation absent from the SAC.

lief because Plaintiffs' claims contemplate liability of unnamed foreign defendants. (Defs.' Mem. at 10.) Plaintiffs fail to respond on this point, arguing only that the injunction they seek establishes redressability. (*See* Opp'n at 10–11.)

On the issue of injunctive relief, Toyota points out that the Court recognized an injunction ordering the named Toyota Defendants to implement an ETCS failsafe will have no impact on those vehicles manufactured and sold by non-parties. (Defs.' Mem. at 10.) Plaintiffs respond that they seek an injunction only against TMC, and since TMC controls the design of all Toyota vehicles, all manufacturing subsidiaries would ultimately be required to comply. (Opp'n at 10.) Plaintiffs protest the fact that Toyota does not explain why the injunction sought by the domestic plaintiffs is any different from that sought by foreign Plaintiffs. (*Id.* at 11 n. 12.)

■ "Constitutional standing requires a plaintiff to demonstrate . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

■ As the Court previously held, an injunction issued here on behalf of foreign Plaintiffs would carry no weight outside of the Court's jurisdiction. Even if the injunction sought in Plaintiffs' prayer for relief can be read as being against TMC only, and assuming the injunction would likely, in effect, "bind" all relevant TMC subsidiaries, this does not change the fact that the Court cannot award damages based on the deceptive marketing practices complained of in the SAC, which were carried out by unnamed foreign entities. This point is discussed more fully in the Court's Rule 19 analysis on joinder. Thus, Plaintiffs have not shown redressability.

#### D. *Conclusion as to Article III Standing*

Although Plaintiffs' allegations meet the injury-in-fact requirement of standing, they fail to meet the causation requirement as to the Defendants other than TMC, and they fail to meet the redressability requirement.

Thus, because Plaintiffs have not carried their burden on all three elements of Article III standing, the SAC is dismissed in its entirety.

### IV. *Rule 19: Necessary and Indispensable Parties*

#### A. *Legal Standard*

In the Dismissal Order, the Court set forth the legal standard under Rule 19 for when a party is necessary and indispensable, and if so, whether the suit may proceed without that party. (Dismissal Order, 785 F.Supp.2d at 903–05.) The Court adopts those legal principles here.

#### B. *Summary of Earlier Ruling*

In the Dismissal Order, the Court examined whether the conduct complained of was solely that of the parent company, TMC, and the other named Defendants, or whether unnamed foreign entities were active participants in the conduct. (*Id.* at 905.) In the prior complaint, Plaintiffs targeted entities responsible for the "manufacture, design, distribution, sale, and lease" of Plaintiffs' vehicles. (*Id.*) The Court noted that unnamed foreign entities were responsible allegedly for manufacture, distribution, repairs, and possibly advertising. (*Id.*) Moreover, only TMC was responsible for design. (*Id.*) The Court found that Plaintiffs' now-dismissed claims for products liability and breach of warranty implicated the manufacturer, distributor, and/or seller/lessor.

The Court concluded that it could not afford complete relief without the unnamed entities, making them necessary under Rule 19(a). (*Id.* at 906–07.) The Court further found that it was not feasible to join these entities under Rule 19(b) because the Court lacks personal jurisdiction over them. (*Id.* at 907.) The Court concluded that the unnamed foreign entities would be prejudiced by being deprived of "an opportunity to defend their product safety and marketing practices." (*Id.* at 907–08.) The Court cited a danger where the parent company may want to shield itself by shifting blame to absent subsidiaries, as well as the risk of inconsistent outcomes. (*Id.* at 908–09.) The Court dismissed the prior complaint because "in equity and good conscience" the case could not proceed without the unnamed foreign entities. (*Id.* at 909–10.)

### C. *Amendments to SAC*

In the motion to dismiss the SAC, Toyota argues that the SAC suffers from the same joinder deficiencies as the prior complaint. (Defs.' Mem. at 13.) Toyota contends that foreign Plaintiffs' claims are still centered around actions by unnamed Toyota defendants "actively involved in advertising, distribution[,] and sale of the vehicles that they purchased, not against the U.S. Toyota Defendants who were involved only with U.S. vehicles 'having the same SUA defect.'" (*Id.* (quoting SAC ¶ 15).) Toyota further argues that Plaintiffs' new allegations regarding Canada and Mexico demonstrate the unnamed foreign entities are both necessary and indispensable. (*Id.* at 14–15.)

Moreover, although Plaintiffs seek to narrowly recast their products liability claim as being solely design-based, in an attempt to make the manufacturers unnecessary parties, Toyota argues that Plaintiffs' current design-defect products liability claim still implicates the manufacturers. (*Id.* at 17 (citing SAC ¶¶ 765, 767).) The negligence claim similarly targets the manufacturers, Toyota contends. (*Id.* (citing SAC ¶ 759).) Toyota maintains inclusion of TEMA as a Defendant confirms that manufacturing is still at issue. (*Id.* at 18.)

Plaintiffs argue in opposition that the SAC abandons all causes of action implicating the manufacture, sale, or lease of Toyota vehicles. (Opp'n at 12.) Plaintiffs contend that to find a subsidiary of TMC or a sister company to TMS a necessary and indispensable part of the lawsuit would be directly at odds with the domestic plaintiffs' case, where no foreign entities were named despite at least five U.S.-sold Toyota models being manufactured outside of the United States. (*Id.* at 13.) Moreover, Plaintiffs argue, the domestic class is defined to include individuals who purchased Toyota vehicles "manufactured, designed, or sold in the United States," yet the domestic plaintiffs were not required to join the manufacturers or distributors. (*Id.* at 14.) Plaintiffs next point to a report discrediting the theory of a manufacturing defect in support of their claim for *design* defect, which they contend bolsters their claim that TMC is "the responsible party for the defective vehicle." (*Id.*) Plaintiffs contend that it would be improper to find unnamed foreign entities who simply implemented the decisions of TMC, TMA, TEMA, and TMS culpable. (*Id.*)

Plaintiffs seek to link advertising and marketing by the named Defendants with customers worldwide by alleging that "TMC's core marketing and sales message, 'Made by TOYOTA,' has been implemented by TMS throughout North America, and by TMC and its other TMC subsidiaries throughout the world[,]" and "the decision to withhold information from worldwide consumers, and to engage in deceptive marketing was made, at least in

part, in California." (*Id.* at 16–17 (quoting SAC ¶¶ 15, 576).)

### 1. *Manufacturing–Based Claims*

▮ In the Dismissal Order, the Court noted that unnamed foreign entities are necessary parties where "they were active participants in the alleged wrongful conduct[.]" (Dismissal Order, 785 F.Supp.2d at 905 (citing *Haas v. Jefferson Nat'l Bank of Miami Beach*, 442 F.2d 394, 398 (5th Cir.1971)); *Polanco v. H.B. Fuller Co.*, 941 F.Supp. 1512, 1520–22 (D.Minn.1996)). Conversely, where "the parent is the principal actor, the subsidiary is not necessary and indispensable." (*Id.* (citing *Dernick v. Bralorne Res. Ltd.*, 639 F.2d 196, 199 (5th Cir.1981)).) Plaintiffs amended their claims in an attempt to render the unnamed manufacturing entities and distributors/sellers unnecessary and dispensable. For example, Plaintiffs deleted the manufacturing defect claim and the breach-of-contract based warranty claims. Instead, Plaintiffs now focus on a design defect theory of liability, as well as their deceptive marketing claims.

Although the SAC continues to reference manufacturing activity, as Toyota points out (*e.g.*, ¶¶ 759, 765, 767), based on the express disavowal of manufacturing-based claims found in paragraph 11 of the SAC, the Court assumes for the purposes of its Rule 19 analysis that the SAC does not predicate claims on manufacturing, and thus does not implicate the manufacturers of Plaintiffs' vehicles.[11] Because the unnamed foreign manufacturers are no longer active participants in the conduct complained of, the analysis regarding the absent manufacturers in the Dismissal Order no longer applies.[12]

### 2. *Deceptive Marketing Claims*

However, Plaintiffs have failed to correct the Rule 19 joinder issues identified in the Dismissal Order with respect to their deceptive marketing claims. In support of these claims, the SAC alleges that Plaintiffs saw various advertising and marketing materials, including billboards, brochures, and window stickers, but Plaintiffs' claims do not suggest that the unnamed foreign entities responsible for the marketing practices complained of were less than active participants in the scheme. Plaintiffs attempt to circumvent this issue by claiming that marketing decisions were made by TMS in California, and by alleging that the advertising statements flowing therefrom reached Plaintiffs in their home countries, but these allegations are contradicted elsewhere in the SAC and by the record before the Court.

First, Plaintiffs admit that TMS is responsible only for U.S.-based marketing.

---

**11.** To the extent the SAC may be read to implicate manufacturing-based claims, the Court could simply order the "stray averments," as Plaintiffs call them, stricken.

**12.** Plaintiffs are incorrect to say that "[i]f the manufacturers of Toyota vehicles are deemed indispensable parties in Foreign Plaintiffs' case, they must be deemed indispensable parties in the domestic plaintiffs' case." (Opp'n at 15.) In jumping to this conclusion, Plaintiffs overlook important differences between their case and that of the domestic plaintiffs. For example, the domestic plaintiffs do not name TEMA as a Defendant, and the claims presented in that case are different than those asserted here. The Rule 19 inquiry is case specific and the Court approaches each analysis as presented. "Rule 19 calls for a pragmatic decision based on practical considerations in the context of particular litigation." *Picuris Pueblo v. Oglebay Norton Co.*, 228 F.R.D. 665, 666 (D.N.M.2005). As such, "[t]here is no prescribed formula for determining in every case whether a person or corporation is an indispensable party or not[.]" *Niles–Bement–Pond Co. v. Iron Moulders' Union, Local No. 68*, 254 U.S. 77, 80, 41 S.Ct. 39, 65 L.Ed. 145 (1920). Thus, the Court's Rule 19 analysis focuses on the parties to the present case.

(SAC ¶ 56.) While Plaintiffs make other references to North America-based marketing (¶ 57), these allegations are not supported by the record. (*See* Gilford Decl. ¶ 3 & Ex. C (Colvin Depo. at 16) (Docket. No. 1673–6) (Q: "[I]s TMS responsible for marketing communications to support the sale and lease of Toyota ... vehicles outside of the United States?" A: "No, it's not.").)[13]

Plaintiffs argue that this testimony, given by Dionne Colvin, Toyota's 30(b)(6) witness on advertising, should not be considered because it is outside of the complaint, and in any event, only creates "some question" as to whether the domestic Defendants were responsible for advertising viewed by Plaintiffs. (Opp'n at 17.)

 As it did in the Dismissal Order, the Court may consider this testimony to resolve the motion under Rule 12(b)(7). "In ruling on a dismissal for lack of joinder of an indispensable party, a court may go outside the pleadings and look to extrinsic evidence." *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 480 (7th Cir.2001). The Court "has a duty to protect absent persons who will be affected by [its] decree," thus, the inquiry into whether such persons exist "should not be hampered by the evidentiary rules [Plaintiffs] would impose." *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir.1960) (considering affidavits

over non-moving party's objection). Moreover, "evidence concerning absent indispensable parties may also be presented by the affidavit of any person having knowledge bearing upon their existence." *Id.*

At oral argument, Plaintiffs again objected to the testimony, arguing that it was unfair to give weight to the testimony when foreign Plaintiffs were not allowed to cross examine the deponent. Toyota pointed out that Plaintiffs were already given the opportunity to submit questions to be asked at the Colvin deposition. A review of the record demonstrates that Plaintiffs were given such an opportunity, one they took advantage of by submitting questions in advance of the deposition.[14] To the extent these questions were outside the scope of the 30(b)(6) topic of marketing and advertising, Plaintiffs admitted at the hearing that Toyota's objections were proper.

 Here, the sworn deposition testimony of Ms. Colvin speaks to TMS's role in worldwide advertising. The fact that TMS is responsible for advertising only in the United States, absent factual allegations linking TMS's U.S.-based advertising with foreign Plaintiffs, confirms that the responsible parties have not been named in the SAC. Those entities are not present here and the Court must consider whether

---

**13.** The Court rejects the argument Plaintiffs raised at oral argument that a distinction should be made between Toyota's "marketing message," on which Plaintiffs rely, and the "marketing communications" referenced in Ms. Colvin's deposition. When read in context, the testimony clearly pertains to marketing and advertising activities, generally. The question directly preceding the "marketing communications" question helps demonstrate this point. *See id.* at 16, transcript page 180:10–13 (Q: "Do you ever research outside the United States, TMS?" A: "For the advertisement that is designed in the U.S. market?").

**14.** *See* March 23, 2011 Hearing Tr. at 56–59 (explaining how domestic plaintiffs' counsel Mr. Robinson "was kind enough to ask some questions on behalf of the foreign Plaintiffs' class" but that some questions were objected to as outside the scope). At that hearing, the Court stated that, "to the extent the foreign Plaintiffs could benefit from the knowledge produced in these 30(b)(6) depositions there ought to be an opportunity for that." *Id.* at 58:3–6. Toyota's counsel confirmed that questions regarding TMS's marketing activities were allowed, *id.* at 59:7–10, as evidenced by the Colvin deposition transcript.

they are necessary and indispensable. Plaintiffs' argument that the Court must "accept all the factual allegations in the complaint as true" (Opp'n at 17), is not well taken because that standard applies to motions to dismiss under Rule 12(b)(6), not motions to dismiss for failure to join under Rule 12(b)(7). It is well settled that courts may look to extrinsic evidence on motions for failure to join. *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1359 (3d ed. 2007) (in considering a Rule 12(b)(7) motion to dismiss, a district court "is not limited to the pleadings").

■ The Court also rejects the argument that consideration of this evidence necessarily converts Toyota's motion to dismiss to a motion for summary judgment. (*See* Pltfs.' Resp. to RJN at 7 (Docket No. 1800).) A court may consider extraneous evidence when deciding a Rule 12(b)(7) motion without converting it into a motion for summary judgment. *Ray v. Int'l Bank, Inc.*, No. 04–CV–02221–MSK–BNB, 2005 WL 2305017, at *4 (D.Colo. Sept. 21, 2005) (citing *Citizen Band Potawatomi Indian Tribe of Oklahoma*, 17 F.3d at 1293).

Plaintiffs mischaracterize the Court's citation to this testimony in the Dismissal Order. The Court did not say that the testimony created an open question regarding whether the domestic Defendants were responsible for advertising disseminated abroad. Rather, the Court noted disagreement between what Toyota's witness said about advertising (*i.e.,* TMS handles only U.S. advertising), and what Plaintiffs claimed in opposition (*i.e.,* U.S.-based advertising reached foreign Plaintiffs in their home countries). (*See* Dismissal Order, 785 F.Supp.2d at 899.) The testimony itself speaks to whether TMS is responsible for advertising outside of the United States: The testimony establishes it is not. Now that Plaintiffs have abandoned their former theory about domestic advertisements being subtitled and broadcast into foreign countries, the "question" previously identified by the Court is now resolved.

Second, as explained in the Court's analysis on standing, Plaintiffs fail to allege facts supporting the assertion that TMS's marketing efforts reached Plaintiffs in their home countries. Plaintiffs do not explain how allegedly California-based marketing decisions by TMS had worldwide impact. (SAC ¶ 15.) This is a conclusion unsupported by allegations lacking factual content. Plaintiffs' deceptive marketing claims appear to turn on marketing practices by unnamed foreign entities, not actions by TMS. Plaintiffs even admit that the foreign entities are responsible for marketing in their home countries. "TMC's core marketing and sale [sic] message, 'Made by TOYOTA,' has been implemented by TMS throughout North America, and by TMC *and its other TMC subsidiaries* throughout the world." (SAC ¶ 576 (emphasis added).) [15]

**15.** To the extent Plaintiffs argue that TMC is principally responsible for a single advertising message that is pushed down through the organization without input or discretion by TMS and/or other TMC advertising subsidiaries (SAC ¶ 145), which in Plaintiffs' assessment would resolve the joinder problem, because the only federal cause of action for RICO is dismissed, the Court has discretion to decline supplemental jurisdiction over the remaining state law claims. If TMC is left as the only Defendant, Plaintiffs may not proceed under diversity jurisdiction because there is not *complete* diversity between foreign Plaintiffs and a foreign Defendant. *See Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 580, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ("The foreign citizenship of defendant Ruhrgas, a German corporation, and plaintiff Norge, a Norwegian corporation, rendered diversity incomplete."); *Faysound Ltd. v. United Coconut Chems., Inc.,* 878 F.2d 290,

Plaintiffs' allegations regarding Mexico and Canada do not suggest that the deceptive marketing claims with respect to North America can be resolved without absent parties. Although the Court is inclined to ignore the untranslated Mexican website of Toyota Motor Sales de Mexico, S. De R.L. de C.V. (*see* RJN Ex. 1), taking Plaintiffs' argument as true, even if the website says the content is owned by "the Toyota Organization" (Opp'n at 18), this is insufficient to support an allegation that TMS provided marketing and advertising materials viewed by Plaintiffs in Mexico. No explanation is provided regarding the term "Toyota Organization," and the term is too vague to implicate specific domestic Defendants such as TMS. With respect to Canada, the brochure cited by Plaintiff was produced by Toyota Canada, Inc. (SAC ¶ 610, incorporating brochure found at Defs.' RJN, Ex. 3), an unnamed foreign entity.

### D. *Rule 19 Conclusion*

For the reasons discussed in the Dismissal Order, with respect to North American Plaintiffs' deceptive advertising claims, Toyota Canada, Inc.,[16] and Toyota Motor Sales de Mexico are necessary and indispensable parties under Rule 19. With respect to foreign Plaintiffs in the rest of the world, the Court stands by the Rule 19 conclusion reached in the Dismissal Order as to the deceptive marketing claims. The unnamed parties whose conduct is implicated in the SAC are necessary under Rule 19(a). Moreover, Plaintiffs fail to address the feasability concerns previously raised by the Court. The Court lacks

personal jurisdiction over these entities, and a finding of prejudice under Rule 19(b) suggests that proceeding without them would be against equity and good conscience. (*See* Dismissal Order, 785 F.Supp.2d at 907–09.)

The Court dismisses all claims for failure to join indispensable parties.

### V. *Standard for Dismissal Pursuant to Rule 12(b)(6)*

Pursuant to Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (2009).

In resolving a Rule 12(b)(6) motion under *Twombly*, the Court must follow a two-pronged approach. First, the Court must accept all well-pleaded factual allegations as true, but "[t]hread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949. Nor must the Court "accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949–50 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. This determination is context-specific, requiring the Court to draw on its experience and common sense;

---

294 (9th Cir.1989). Because the SAC is dismissed on other grounds, this situation is not present and the Court need not decide whether to exercise supplemental jurisdiction over any claims.

**16.** Of additional concern is the separate putative class action currently pending against Toyota Canada, Inc., which Plaintiffs do not address. *See* Gilford Decl. ¶ 6, Ex. G. This ruling will avoid duplicitous litigation with the potential for conflicting results. (*See* Dismissal Order, 785 F.Supp.2d at 908.)

there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

In addition to the factual allegations set forth in the complaint, courts may consider documents referenced in the complaint, upon which the complaint necessarily relies, and the authenticity of which no party questions. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998) ("We therefore hold that a district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies."); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."). Moreover, as noted previously, courts may also consider judicially noticed materials. *Mir*, 844 F.2d at 649.

The Court notes that, in some instances, Plaintiffs have referred to specific documents in support of their factual allegations. These documents have not been examined by the Court, and the Court expresses no opinion regarding whether they support the allegations made in the SAC.

## VI. *RICO*

### A. *Factual Allegations Underlying RICO Claim*

Plaintiffs' allegations regarding their RICO claims are set forth in the SAC and their RICO Case Statement ("RCS") (Docket No. 1582). Where the RCS and the SAC differ, the Court relies upon the allegations set forth in the SAC because it is the operative pleading. (*Compare, e.g.*, RCS at 2 (purporting to "bring ... RICO claims against Akio Toyoda and Yoshihiro Inaba") *with* SAC (those individuals not named as defendants).)

In the SAC and RCS, Plaintiffs describe an associated-in-fact enterprise they term the "Misleading Marketing Enterprise" ("MME") comprised of all four Toyota Defendants. (SAC ¶ 662; RCS at 2.) Specifically, Plaintiffs allege that

> [s]ince at least 2004 (and thereafter when these entities came into being), TMC, TMA, TEMA and TMS have associated-in-fact to conduct certain aspects of Toyota's "marketing, advertising, promotion and sales and leasing" activities ("misleading marketing enterprise") by means of false statements and omissions of material facts to sell and lease certain Toyota Vehicles known to Toyota to be unreasonably dangerous and defective through a pattern of racketeering activity [constituting of predicate acts of mail fraud and wire fraud].

(SAC ¶ 662.)

Within this MME, TMC's role was to design, build, and sell defective Toyota vehicles prone to SUA. (SAC ¶ 667; RCS at 2.) TMA had the same role, but in addition, through the remaining two Defendants (TEMA and TMS), also handled sales, marketing, engineering, and marketing operations throughout North America. (SAC ¶ 670; RCS at 3.) TMS's role was selling, distributing, and marketing the defective vehicles. (SAC ¶ 668; RCS at 3.) TEMA is "responsible for engineering, design, research and development, and manufacturing activities" and it "designed, developed, distributed and marketed" the defective vehicles. (SAC ¶ 669; RCS at 3.)

The pattern of racketeering activity is alleged to be acts furthering the sale and lease of vehicles having known defects, including purposeful acts designed to defraud consumers regarding the safety of

those vehicles and misrepresentations regarding those defective vehicles. (SAC ¶¶ 671–73; RCS at 4–5.) Those activities included (1) wire and mail communications made to consumers in the form of commercials, marketing materials, and internet marketing; (2) wire and mail communications to dealers; (3) wire and mail communications to the National Highway Traffic Safety Administration ("NHTSA"); and (4) wire and mail communications in public statements. (RCS at 4–5.) More specifically, the SAC alleges the following predicate acts [17] of mail fraud and wire fraud:

- In November 2005, in a letter to NHTSA, Christopher Tinto, represented that there was no evidence of system or component failure in two vehicles under investigation by NHTSA. (SAC ¶ 684.)

- Other similar communications designed to exert undue influence over NHTSA's investigation into SUA. (SAC ¶¶ 685, 687, 690–91.)

- In September 2009, Toyota issued a press release regarding a high-profile collision that resulted in multiple fatalities, claiming the collision was caused by incorrectly installed floor mats. (SAC ¶ 698.)

- Similar press releases, conference calls, and letters regarding floor mats as the cause of SUA and the denial that the ETCS plays any role in SUA. (SAC ¶¶ 699–701, 704, 706, 708.)

- Press release announcing the installation of a brake override system "as

an extra measure of confidence." (SAC ¶ 703.)

Plaintiffs allege that they were damaged in that they were induced to buy or lease a vehicle that they would not have bought or leased had they known about the defects, or that they would not have paid as much to buy or lease the vehicles had they been aware of these defects. (SAC ¶¶ 712; RCS at 46.)

In the present Motion to Dismiss, the Toyota Defendants argue that Plaintiffs fail to state a claim for a violation of RICO. Because Plaintiffs again fail to meet the pleading-with-particularity requirement regarding the RICO predicate acts, and because Plaintiffs again fail to sufficiently allege that the RICO "person" is distinct from the RICO "enterprise," the Court agrees.

**B. _RICO's Extraterritorial Reach_**

In the Dismissal Order, the Court discussed at length the presumption against the extraterritorial application of RICO but, without deciding the issue, allowed for the possibility that a RICO claim could proceed even though the actions of the Defendants (and the ensuing harm) were felt outside the United States, so long as the RICO enterprise operated domestically. (Dismissal Order, 785 F.Supp.2d at 914–15.) Although the Court agrees generally with Toyota's observation that Plaintiffs fail to address the extraterritoriality issue in the Opposition, _see_ Reply at 4, because the Court concludes that Plaintiffs' RICO claim must be dismissed for other reasons, for purposes of the present

---

**17.** Plaintiffs also allege generally that the Toyota Defendants have engaged in actions constituting "thousands of mail and wire fraud violations over ... the last five to eight years." (SAC ¶ 671.) However, as noted in the Dismissal Order, because the pleading-with-specificity requirement of Rule 9(b) applies to predicate acts of mail and wire fraud,

_Edwards v. Marin Park, Inc.,_ 356 F.3d 1058, 1065–66 (9th Cir.2004), the Court considers only those acts identified with specificity in the SAC. This is not to say that all the alleged predicate acts summarized above meet the Rule 9(b) requirements; that issue is discussed separately, below.

discussion, the Court merely assumes without deciding that to the extent that RICO predicate acts are alleged to have been committed in the United States, the presumption against RICO's extraterritorial reach does not entirely preclude Plaintiffs' RICO claim.

## C. *RICO Elements and Pleading–with–Particularity Requirements*

■ As noted in the Dismissal Order, "[t]he elements of a civil RICO claim are as follows: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir.2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir.1996)). An "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Racketeering activity is any act indictable under any of the statutory provisions listed in 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires the commission of at least two such acts within a ten-year period. 18 U.S.C. § 1961(5).

■ Where, as here, the alleged predicate acts of racketeering activity are acts of mail fraud and wire fraud, the pleading requirements of Rule 9(b) apply to the alleged predicate acts. *Edwards,* 356 F.3d at 1065–66 (Rule 9(b) "applies to civil RICO fraud claims."); *see also* Dismissal Order, 785 F.Supp.2d at 918–19 (collecting cases).

■ Under Rule 9(b), "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir.2003) (internal quotation marks omitted). In the context of RICO, Rule 9(b) requires that the Plaintiffs "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 405 (9th Cir.1991) (citing Fed.R.Civ.P. 9(b)). A plaintiff may not simply lump together multiple defendants without specifying the role of each defendant in the fraud. *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir.2007).

■ In the Dismissal Order, the Court identified a number of pleading deficiencies which Plaintiffs have failed to cure, most importantly the failure to ascribe any predicate act to a particular Defendant rather than impermissibly ascribing conduct to "Toyota" or "Defendants" generally. (*See* Dismissal Order, 785 F.Supp.2d at 919; *cf.* SAC ¶ 679 (referring to Vice President of Regulatory Affairs "in Toyota's Washington, D.C., office"), ¶ 684 (describing letter comprising an act of mail fraud without attributing action to any particular defendant), ¶ 690 ("Toyota intentionally and falsely denied in documents mailed to NHTSA ... that the [ETCS] contribute[d] to a SUA event."), ¶ 699 ("Toyota" issued a press release), ¶ 700 (participant in conference call identified as a vice president with an non-party entity referred to "Toyota USA"), & ¶ 704 (referring to statement made on conference call by "Toyota spokesman")). In some instances, Plaintiffs have attributed certain statements to named individuals (*see, e.g.,* SAC ¶¶ 679 & 704), but the Toyota entity upon whose behalf such statements were made is not identified, and the individuals themselves are not named as parties. Thus, although the what, when and where are sometimes alleged, the "who" is never identified.

Accordingly, Plaintiffs have failed to state a claim for violation of RICO because they have not adequately alleged predicate acts of racketeering activity.

### D. Section 1962(c) Pleading Requirements

■ Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In the Dismissal Order, the Court discussed at length Plaintiffs' failure to meet the distinctness requirement of § 1962(c). (Dismissal Order, 785 F.Supp.2d at 921–22.) Specifically, "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (a) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).

In *Cedric Kushner Promotions*, the Supreme Court held that the distinctness requirement was satisfied where the RICO person was an individual and the RICO enterprise was his wholly owned corporation. *Id.* at 166, 121 S.Ct. 2087. However, the Court contrasted the facts presented in *Cedric Kushner Promotions* with earlier cases in which the corporate entity is both the "person" and the "enterprise," such as in *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339 (2d Cir.1994), where the "corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enter-

prise.'" *Cedric Kushner Promotions*, 533 U.S. at 164, 121 S.Ct. 2087. The Supreme Court expressly left undisturbed the holdings in those cases. *Id.*

■ As the Court noted in the Dismissal Order, the instant case is much more similar to *Riverwoods Chappaqua* than *Cedric Kushner Promotions*, and the Court is compelled to again conclude that Plaintiffs have set forth insufficient allegations regarding the distinctness of Defendants as RICO "persons" and the associated-in-fact enterprise Defendants have allegedly formed.[18] Plaintiffs allege that the four named, affiliated corporate Defendants are both the RICO "person[s]" and the associated-in-fact "enterprise." As before, although Plaintiffs identify conduct committed by certain individual employees, none of these employees are named as defendants.

As the Supreme Court observed in *Cedric Kushner Promotions*, insofar as RICO seeks "to prevent a person from using a corporation for criminal purposes, . . . the person and the tool[ ] are different entities, not the same." 533 U.S. at 162, 121 S.Ct. 2087. Here, Plaintiffs allege that the RICO person and the tool are the same entities and, therefore, Plaintiffs have not met the distinctness requirement.

Here, as in *Riverwoods Chappaqua* and the case upon which it relies,[19] Plaintiffs merely allege that the Defendants are associated in a manner directly related to their own primary business activities, which is insufficient to state a claim under § 1962(c). Indeed, the SAC alleges no more than that Defendants' primary business activity—the design, manufacture,

---

**18.** Because mere legal labels lack the requisite "factual content" that *Iqbal* and *Twombly* require, the Court must disregard Plaintiffs' conclusory allegations. (*See, e.g.*, SAC ¶ 675 (labeling all Defendants RICO "persons" who

participated in the MME "through a pattern of racketeering activity").)

**19.** *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 440–41 (5th Cir.1987).

and sale or lease of Toyota vehicles—was conducted fraudulently. This overarching allegation is incompatible with the types of conduct RICO was enacted to prevent: To "protect[ ] a legitimate 'enterprise' from those who would use unlawful acts to victimize it, ... and" to "protect[ ] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful ... activity is committed.'" *Cedric Kushner Promotions,* 533 U.S. at 164–65, 121 S.Ct. 2087 (citations omitted); *cf. Riverwoods Chappaqua,* 30 F.3d at 343–44 (dismissing RICO claim where alleged associated-in-fact enterprise merely carried on the business of one of the entities allegedly comprising the association-in-fact); *Atkinson,* 808 F.2d at 440–41 (similar).

In this regard, the present case stands in stark contrast to *Living Designs,* 431 F.3d at 361–62, in which, post-*Cedric Kushner Promotions,* the Ninth Circuit found the distinctness requirement was met. In *Living Designs,* the court found distinctness between a corporation and an associated-in-fact enterprise composed of that corporation, the law firms it retained, and certain expert witnesses involved in prior litigation between that corporation and the plaintiffs. *Id.* The court noted the fundamental difference between the business of the corporation and the law firms it employed, relying especially on compelled independence of the law firms, dictated by rules of professional conduct. *Id.* That difference in the nature of the business of the RICO person and the nature of the activities of the associated-in-fact enterprise contributed significantly to the court's finding that the distinctness requirement had been met. *See id.* Such is not the case here.

The sole case cited by Plaintiffs in their Opposition does not counsel or compel a contrary result. *(See* Opp'n at 31.) Plaintiffs rely on *Sussex Fin. Enterprises, Inc.* *v. Bayerische Hypo-und Vereinsbank AG,* No. 08–4791 SC, 2010 WL 94272, at *4 (N.D.Cal., Jan. 6, 2010), in which the court rejected an argument that a parent corporation and its subsidiaries can never be "sufficiently distinct to establish both a RICO 'person' and a RICO 'enterprise.'" *Id.* However, *Sussex* did not hold that in all instances, the mere fact that a parent and its subsidiaries are separate legal entities necessarily compels the conclusion that the RICO distinctness requirement is met. Indeed, the *Sussex* court noted one of the distinctions made by the Court today, that distinctness requirement is more likely met when "employees operate with outside individuals." *Id.*

In reaching its conclusion that the distinctness requirement was met, the *Sussex* court found significant the allegations that particular individuals and subsidiaries "drove the alleged fraud," that other related corporate entities were skeptical of portions of certain transactions in which those individuals and subsidiaries engaged, and that one defendant appeared to have "actually infiltrated" another entity, "deceiv[ing] it and] its legitimate business operatives." *Id.* Plaintiffs' allegations here do not parallel those made in *Sussex.* Plaintiffs do nothing more than allege that Defendants associated in fact to carry on their own primary business purposes, which is insufficient to meet the distinctness requirement.

Accordingly, Plaintiffs have not stated a claim under § 1962(c), which is the sole remaining RICO claim set forth in the SAC. The Court grants the Motion to Dismiss Plaintiffs' RICO claim.

## VII. California Consumer Fraud Claims and Fraudulent Concealment

### A. Extraterritorial Reach of UCL & CLRA

In the Dismissal Order, the Court agreed in theory that Plaintiffs might be

able to state a CLRA or UCL claim "based on California conduct having effects outside California." (Dismissal Order, 785 F.Supp.2d at 917.) However, the Court concluded that Plaintiffs' allegations were insufficient to link the conduct complained of with California. Specifically, Plaintiffs did not "allege with sufficient detail that the point of dissemination from which advertising and promotional literature that they saw or could have seen is California." (*Id.* at 917.)

In the SAC, Plaintiffs have not cured this deficiency. Thus, the Court concludes that Plaintiffs have not demonstrated that either the CLRA or the UCL may be applied extraterritorially to them.

### B. *UCL & CLRA Analysis*

As the Court previously stated, claims grounded in fraud must meet the heightened pleadings requirements of Rule 9(b). To survive a motion to dismiss, Plaintiffs' fraud claims must state the "who, what, when, where, and how" of the alleged fraudulent conduct. *Vess*, 317 F.3d at 1106. Although Plaintiffs' prior complaint alleged the "what," "when," and "how," the allegations failed to state *who* made the representations or *where* Plaintiffs saw the relevant advertisements and representations. (Dismissal Order, 785 F.Supp.2d at 923–24.) The Court also found the prior complaint lacking for failure to "allege a connection between specific Toyota Defendants and advertisements disseminated outside of the United States." (*Id.*)

At oral argument, Plaintiffs pointed out that they need not identify the specific advertisements they saw when they rely on a longstanding advertising campaign. As the Court previously noted with respect to the domestic plaintiffs, when "misrepresentations and false statements were part of an extensive and long-term advertising campaign," Plaintiffs need not "demon-

strate individualized reliance on specific misrepresentations or false statements." *In re Tobacco II Cases*, 46 Cal.4th 298, 327, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009). In relying on this principle, Plaintiffs misconstrue the pleadings deficiency identified by the Court. Plaintiffs are not required to cite specific advertisements, but pointing to a long-term advertising campaign does nothing to answer the questions of "who" or "where." While Plaintiffs argued that "where" was specific cities in Canada and Mexico, they failed to connect averments of advertising in these cities with factual allegations regarding TMS's involvement.

#### 1. *CLRA Notice*

Toyota argues that Plaintiffs fail to satisfy the CLRA notice requirements. (Defs.' Mem. at 24.) Plaintiffs respond that they satisfied the CLRA notice requirements by virtue of a letter sent to Toyota by eleven domestic plaintiffs. (Opp'n at 30.)

 The CLRA requires written notice and demand thirty days before commencement of a suit. Cal. Civ.Code § 1782(a). "The purpose of the notice requirement of section 1782 is to give the manufacturer or vendor sufficient notice of alleged defects to permit appropriate corrections or replacements.... The clear intent of the act is to provide and facilitate precomplaint settlements of consumer actions wherever possible and to establish a limited period during which such settlement may be accomplished. This clear purpose may only be accomplished by a literal application of the notice provisions." *Outboard Marine Corp. v. Superior Court*, 52 Cal.App.3d 30, 40, 124 Cal.Rptr. 852 (1975).

 Literal application of section 1782(a)'s notice requirement suggests that notice given by domestic plaintiffs is insuf-

ficient to serve as a proxy for notice by foreign Plaintiffs. This is a separate action for damages, thereby triggering the notice requirement as to these Plaintiffs. Although section 1782(d) waives the notice requirements where only injunctive relief is sought, this section is inapplicable to the extent foreign Plaintiffs also seek damages. The CLRA is intended to foster early settlement. Thus, where foreign Plaintiffs are not parties to the domestic complaint and any settlement thereunder would have no effect on foreign Plaintiffs, the notice provided by domestic plaintiffs to Toyota does not serve the goals of the CLRA with respect to resolution of foreign Plaintiffs' claims.

### 2. Amended Statutory Claims

Toyota argues that the SAC's fraud allegations are substantively identical to the now-dismissed fraud allegations, and must therefore be dismissed. (Defs.' Mem. at 25.) Plaintiffs contend that the "who" is "Toyota" and the "where" is "worldwide." (Opp'n at 24.) [20]

Even if the Court overlooks the CLRA's notice requirements based on notice by domestic plaintiffs, foreign Plaintiffs have not corrected the Rule 9(b) pleadings deficiencies previously identified by the Court. Both the UCL and CLRA claims are insufficient for failure to allege with particularity the "who" and the "where." Although the Court previously held that alleging "Toyota" is insufficient to state what entities made which statements (Dismissal Order, 785 F.Supp.2d at 923–24), Plaintiffs nonetheless aver that the statements were made by "Toyota." See Swartz, 476 F.3d at 764. Moreover, Plaintiffs' "where" allegation that the statements were made "worldwide" does nothing to address how

the named Defendants' advertising activities in California reached and impacted Plaintiffs who viewed advertisements in their home countries (e.g., billboards, window stickers).

### C. Fraudulent Concealment

Fraud by concealment is actionable only if the defendant had a duty to disclose the concealed fact. Baggett v. Hewlett–Packard Co., 582 F.Supp.2d 1261, 1267 (C.D.Cal.2007). In the Dismissal Order, the Court found that Plaintiffs alleged both a duty to disclose and justifiable reliance. However, Plaintiffs' allegations as to fraudulent concealment failed to state the "who" and the "where." (Dismissal Order, 785 F.Supp.2d at 924.) The Court again rejected general allegations about "Toyota" as the maker of the false statements. (Id.) Plaintiffs did not explain how the named Toyota Defendants "interacted with foreign Plaintiffs such that Toyota's alleged fraudulent omissions reached and impacted foreign Plaintiffs." (Id. at 924.)

Toyota points out that the SAC again adopts the domestic plaintiffs' allegations regarding advertising, without explaining how this advertising relates to foreign Plaintiffs. (Defs.' Mem. at 26.) No specific misstatements or omissions are alleged to have reached and impacted foreign Plaintiffs, and the advertising referenced in Canada and Mexico was not created by any of the named Defendants. (Id.) As they did in response to the statutory fraud arguments, Plaintiffs contend that the "who" is "Toyota" and the "where" is "worldwide." (Opp'n at 24.)

For the reasons set forth above in the discussion of Plaintiffs' statutory fraud claims, Plaintiffs common law fraudulent

**20.** Plaintiffs also argue if their common law fraud claim is deficient, no other claims are impacted because the CLRA claim is premised on "deception." (Opp'n at 24.) This argument fails because deception is synonymous with fraud.

concealment claim also fails to meet Rule 9(b)'s heightened pleading requirement. In addition to omitting the "who" and the "where" of this claim, with respect to North America, Plaintiffs do not plead facts with particularly regarding the significance of the advertising examples from Canada and Mexico. No facts are alleged linking these advertisements to any named Defendant, and no facts suggest any named Plaintiff viewed and relied on this advertising. Accordingly, Plaintiffs' fraud-based claims must be dismissed.

### D. Conclusion Regarding California Consumer Fraud Claims and Fraudulent Concealment

The Court grants the Motion to Dismiss and dismisses Plaintiffs' UCL, CLRA, and fraudulent concealment claims.

### VIII. Products Liability (Design Defect) and Negligence

Toyota urges dismissal of Plaintiffs' products liability and negligence claims on three grounds: First, the continuing failure to differentiate among the Toyota Defendants; second, the failure to sufficiently allege a claim as to the domestic Toyota Defendants (because these entities are not alleged to have designed the defective vehicles); and finally, the failure to sufficiently allege damages. (Defs.' Mem. at 27–30.)

At the outset, the Court notes that Plaintiffs' purported incorporation of its previous arguments regarding products liability and negligence is unavailing. (See Opp'n at 32.) Specifically, Plaintiffs purport to incorporate arguments from their Opposition to the Motion to Dismiss the AFELMCC that, ostensibly, address the first two grounds urged by Toyota for dismissal of Plaintiffs' products liability and negligence claims. (Id.) Notably, Plaintiffs fail to provide pinpoint citations to that document, instead directing the Court to "see generally Dkt. No. 805–1." (Id. (italics in the original).) The Court's review of the previous Opposition reveals that it does not discuss the merits or pleading sufficiency of these claims. Nor did the Dismissal Order address the pleading sufficiency of these claims, instead dismissing them on grounds applicable to all claims, including standing and joinder. That both the Dismissal Order and the earlier Opposition did not separately address the pleading sufficiency of these claims is unsurprising, as Toyota did not separately urge dismissal on these grounds. Plaintiffs are incorrect when they say the Toyota Defendants' present Motion "simply regurgitate[s] their arguments ... from their prior Motion." (Opp'n at 32.) By the same token, their invocation of this Court's admonition that all parties to this MDL should strive to "precisely and concisely define the issues before the Court" is inapt. (See Opp'n at 32 n. 22 (quoting May 13, 2011, Order, 790 F.Supp.2d 1152 (C.D.Cal.2011)).)

Regarding the second ground for dismissal, Plaintiffs' criticism of Toyota's "stream of commerce" argument is not well-taken. Plaintiffs make a conclusory allegation in support of their negligence claim that Defendants "placed Toyota Vehicles into the stream of commerce." (Compare Opp'n at 32 with SAC ¶ 760 (emphasis added).)

As to the first two grounds urged for dismissal, the Court notes that the SAC's wholesale failure to meaningfully differentiate among the Defendants would ordinarily require dismissal of and repleading of these claims, especially in light of the conflict inherent in Plaintiffs' express disavowal of claims based on manufacturing defects and the "stray averments" regarding misdeeds related to the vehicles' manufacture. (Opp'n at 12 (characterizing alle-

gations regarding manufacture as "stray averments"); *compare* SAC ¶ 11 (disavowing manufacturing claims) *with* SAC ¶¶ 759, 765 & 767 (basing products liability and negligence claims on, *inter alia,* manufacture).) So, too, would Plaintiffs be called upon to clarify their allegations regarding which entities are alleged to be responsible for the defective design of the vehicles.[21] (*Compare* ¶ 2 (alleging that all Defendants "responsible for the design, marketing, sale, and lease of tens of millions of vehicles, or parts thereof") *and* ¶¶ 669–70 (alleging that TEMA and TMA are "responsible for" or "handled," *inter alia,* "design" of the defective vehicles) *with* Opp'n at 30–31 (defending sufficiency of RICO entity allegations by drawing clear-cut distinctions among the activities of the Defendants, and attributing "design[ ]" to TMC, "market[ing]" to TMS, "distribut[ing] and market[ing]" to TEMA, and the handling of "government and regulatory matters" to TMA).) Because dismissal on these grounds is required, as explained *supra,* sections III and IV, repleading these claims in this Court would serve no purpose.

 The third ground raised by Toyota also requires dismissal: Plaintiffs fail to allege damages. This is a pleading element required of both a products liability claim and a negligence claim. A negligence claim under California law requires plaintiff to allege that defendant "owed [plaintiff] a legal duty, breached the duty, and that the breach was a proximate or legal cause of [plaintiff's] injury." *Gonzalez v. Autoliv ASP, Inc.,* 154 Cal.App.4th 780, 793, 64 Cal.Rptr.3d 908 (2007). Additionally, "[a] manufacturer may be held strictly liable for placing a defective prod-

uct on the market if the plaintiff's injury results from a reasonably foreseeable use of the product." *Saller v. Crown Cork & Seal Co., Inc.,* 187 Cal.App.4th 1220, 1231, 115 Cal.Rptr.3d 151 (2010). Each theory requires that a plaintiff plead and prove causation and damages. *See County of Santa Clara v. Atlantic Richfield Co.,* 137 Cal.App.4th 292, 318, 40 Cal.Rptr.3d 313 (2006).

As argued by the Toyota Defendants, and as set forth more fully *supra,* section III.A., Plaintiffs have failed to plead that they suffered cognizable injury in the form of damages as a result of reduction in the resale value of their vehicles in their home countries. Although the Court has ruled that Plaintiffs' benefit-of-the-bargain damages theory is sufficient to meet the injury-in-fact requirement of standing, this theory is not expressly asserted as a basis for damages under the negligence and product liability claims. (*See* SAC ¶¶ 762, 771 (Plaintiffs "have suffered damages including ... the financial loss of owning or leasing the Toyota Vehicles that are unsafe as well as being subjected to potential risk of injury.").) Thus, dismissal is appropriate on this basis as well.

The Court grants the Motion to Dismiss the products liability and negligence claims.

## IX. *Motion to Strike*

The Toyota Defendants move to strike paragraph 39 from the SAC. (*See* Docket No. 1672 at 2–3.) Specifically, the Toyota Defendants move to strike language that confers the legal labels of "aiders and abettors" on each Defendant, that conclusorily alleges that each Defendant is an agent of each other Defendant, and that

---

**21.** Such a clarification would also require that the operative pleading be confined to allegations with factual content stripped of the conclusions of law regarding mutual agency that Plaintiffs have repeatedly included and have presumably relied upon in formulating their allegations. (*See infra* section IX.)

alleges that all actions complained of are to be imputed onto all other Defendants:

39. Defendants, and each of them, are sued as participants in a scheme and conspiracy, and as aiders and abettors herein. At all times material hereto, each Defendant was and is the agent of each of the remaining Defendants, and in doing the acts and omissions alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the other Defendants. There is a unity of interest and ownership between the Defendants listed above, such that the acts of one are for the benefit and can be imputed as the acts of the others.

(SAC ¶ 39.) [22]

In their Opposition, Plaintiffs note that they do not object to the Court striking the references to conspiracy and aiding and abetting; such allegations, they say, "were inadvertently included in the [SAC]." (Opp'n to Mot. to Strike at 1.) What remains, then, is precisely the same language the Court struck from the previous Complaint. (*See* Dismissal Order, 785 F.Supp.2d at 911; *compare* AFELMCC ¶ 86 (Docket No. 46) *with* SAC ¶ 39.)

 Plaintiffs oppose the Motion to Strike by pointing to other paragraphs of the SAC which they contend "describe[ ] the corporate hierarchy and structure of the Toyota Defendants," which "describe[ ] how TMC promoted a common corporate culture," and other similar allegations. (Opp'n to Mot. to Strike at 2.) However, Toyota has not moved to strike those allegations; rather, Toyota moves to strike the language in which Plaintiffs not only summarily attach legal labels to Defen-

dants but also purport to unilaterally confer the legal consequences that result from those labels. At the pleadings stage, before discovery and before adjudication of the issue, the Court simply cannot agree with Plaintiffs' summary conclusion that the other allegations found in the SAC "lead to one conclusion[:] that TMC, as the principal, maintains control over the design and safety of its vehicles which it implements through its agents, TMA, TEMA and TMS." (*Id.*)

As noted by the Court in the Dismissal Order, Plaintiffs may not rest on legal conclusions regarding agency that are cast as factual allegations. *Iqbal,* 129 S.Ct. at 1949. Accordingly, the Court grants the Motion to Strike and strikes ¶ 39 of the SAC.

## X. *Conclusion*

For the reasons set forth herein, the Court grants the Motion to Strike and the Motion to Dismiss, dismissing all claims asserted in the SAC.

**IT IS SO ORDERED.**

---

**22.** Toyota cites SAC ¶ 36; however, an examination of the SAC reveals that they move to strike SAC ¶ 39.